**BALTODANO & BALTODANO LLP**
Hernaldo J. Baltodano (SBN 222286)
Email: hjb@bbemploymentlaw.com
Erica Flores Baltodano (SBN 222331)
Email: efb@bbemploymentlaw.com
1411 Marsh Street, Suite 102
San Luis Obispo, California 93401
Phone: (805) 322-3412
Fax:     (805) 322-3413

**BOREN, OSHER & LUFTMAN LLP**
Paul K. Haines (SBN 248226)
Email: phaines@bollaw.com
Fletcher W. Schmidt (SBN 286462)
Email: fschmidt@bollaw.com
222 N. Sepulveda Blvd., Suite 2222
El Segundo California 90036
Tel: (310) 322-2220
Fax: (310) 322-2228
Attorneys for Plaintiff, the Classes,
and Aggrieved Employees

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE M. JAVINE, as an individual and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SAN LUIS AMBULANCE SERVICE INC., a California Corporation; and DOES 1 through 10,<br><br>Defendants. | Case No.  CV13-07480 BRO (SSx)<br><br>Assigned to Hon. Judge Beverly Reid O'Connell<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO STRIKE AND FOR AN ORDER LIMITING DEFENSE COMMUNICATIONS WITH CLASS MEMBERS AND OTHER RELIEF UNDER FED. R. CIV. P. 23(d)**<br><br>Date:     December 15, 2014<br>Time:    1:30 p.m.<br>Judge:   Hon. Beverly Reid O'Connell |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE THAT** on December 15, 2014 at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 14 of the United States District Court for the Central District of California, located at 312 N. Spring Street, Los Angeles, California 90012-4701, before the Honorable Beverly Reid O'Connell, Plaintiff Leslie M. Javine ("Plaintiff") will and hereby does move under Fed. R. Civ. Proc. 23 and the Court's inherent authority for an order limiting Defendant San Luis Ambulance Service, Inc. ("SLA") from further communicating with its employees regarding this lawsuit, and for other relief detailed herein relating to SLA's coercive and unethical tactics in obtaining scores of declarations and purported settlement agreements from putative class members in the weeks after Plaintiff filed this putative wage and hour class action lawsuit.

As the United States Supreme Court stated in *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981), "a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."   Critical to this motion is the recognized principle that there exists a heightened potential for coercion when an employer has pre-certification communications with potential class members, particularly where, as here, the employer engages in a "coordinated blitz" shortly after a lawsuit is filed to obtain numerous declarations and purported settlement agreements from its employees. *See, e.g., Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218 (S.D. Ala. 2008) (employer used unethical tactics to obtain 245 declarations from employees in the days following the filing of a class action lawsuit).   Courts have long recognized the "strong potential for coercion" that is inherent in an ongoing at-will employer-employee relationship. *Bublitz v. E.I. duPont de Nemours & Co.*, 196 F.R.D. 545, 547, 549 (S.D. Iowa 2000) (ordering that communications between employer and employees regarding topics like a class member's participation in the action be in a writing filed with the Court and provided to plaintiffs' counsel); *Belt*

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

1  *v. Emcare Inc.*, 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003) ("[W]here the absent
2  class member and the defendant are involved in an ongoing business relationship,
3  such as employer-employee, any communications are more likely to be
4  coercive."); *EEOC v. Morgan Stanley & Co.*, 206 F. Supp. 2d 559, 562 (S.D.N.Y.
5  2002) ("Courts have found the danger of such coercion between employers and
6  employees sufficient to warrant the imposition of restrictions regarding
7  communication between defendants and potential class members.") (citing cases).

8        In the weeks and months that followed the filing of this lawsuit, SLA
9  orchestrated an improper scheme to mislead and coerce putative class members to
10  not participate in this lawsuit. Over the course of several in-person meetings and
11  through emails, currently-employed putative class members were induced to sign
12  sworn declarations under false pretenses, agree to an unconscionable and defective
13  arbitration policy or face losing their jobs, and sign egregiously defective
14  settlement agreements and releases as to **all** employment related claims of any
15  nature whatsoever in exchange for a mere $150.

16        SLA then compounded this improper conduct by impeding Plaintiff's efforts
17  to obtain crucial discovery related to these issues. After extensive meet and confer
18  efforts by Plaintiff, SLA produced declarations from approximately 71 putative
19  class members, but refused to accept service of deposition notices for the
20  declarants and refused to provide contact information for the declarants. After
21  weeks of further negotiation, and over Plaintiff's objections, the parties filed a
22  proposed *Belaire-West* notice, which, after it was approved by the Honorable
23  Suzanne H. Segal, was mailed to the putative class on September 11, 2014. **The**
24  **very next day**, on September 12, 2014, Chris Javine, SLA's General Manager and
25  one of the FRCP Rule 30(b)(6) deponents, emailed the putative class warning them
26  against cooperating with Plaintiff's counsel, resulting in all but two of the
27  declarants opting-out of having their contact information disclosed. When Plaintiff
28  succeeded in subpoenaing four of the declarants, SLA's acting General Manager,

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

Chris Javine, **sat across the table** from the witnesses while they were asked candid questions about their employment and the actions of SLA management. Ironically, the declarants were represented at their depositions by counsel paid for by SLA.

Plaintiff now respectfully requests that the Court enter an order: (1) limiting all communication between SLA and potential class members regarding this lawsuit; (2) disregarding the declarations, purported settlement agreements, and arbitration agreements signed by putative class members should SLA attempt to use them for any reason; (3) issuing a curative notice from the Court to potential class members explaining that any declarations, settlement agreements, and arbitration agreements they signed will not be considered by the Court, and that SLA cannot retaliate against them for cooperating with Plaintiff's counsel or otherwise participating in this lawsuit; (4) requiring SLA to produce the contact information for all declarants; and (5) entering any other relief that is warranted under the circumstances.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which began on September 24, 2014 and ended on October 6, 2014. *See* Declaration of Hernaldo J. Baltodano ("Baltodano Decl."), ¶7 and Exhibit F attached thereto. Plaintiff's motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the accompanying Declaration of Hernaldo J. Baltodano and exhibits attached thereto, the proposed order submitted herewith, the pleadings, declarations and papers on file with the Court, and any further briefing and arguments of counsel.

Dated:  November 17, 2014

Respectfully submitted,
BALTODANO & BALTODANO LLP

Hernaldo J. Baltodano
Attorneys for Plaintiff, the Putative Classes
and Aggrieved Employees

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

# **TABLE OF CONTENTS**

I.      INTRODUCTION...............................................................1

II.     FACTUAL BACKGROUND..............................................4

   A.   Summary of the Lawsuit and Relevant Procedural History.......................4

   B.   SLA Undercuts the Court-Approved *Belaire-West* Notice to Solicit Opt
      Outs from the Putative Class Members ................................6

   C.  SLA Attempts to Make Arbitration of All Claims a Condition of Continued
      Employment...............................................................10

   D.  Putative Class Members are Paid $150 for Releasing All Employment-
      Related Claims Based on So-Called "Questionnaires".....................11

III.    SUMMARY OF RELIEF SOUGHT...................................16

IV.     LEGAL ARGUMENT.....................................................16

   A.  Legal Standards Governing This Motion......................................16

   B.  The Court Should Strike the Declarations Because SLA Used Misleading
      and Coercive Tactics to Obtain Them.......................................18

   C.  The Settlement Agreements Are Unenforceable Because They Were
      Fraudulently Obtained and Are Also Unconscionable.....................21

   D.  The Arbitration Agreements Are Also Unconscionable and Do Not Apply
      to the Employer of the Putative Class......................................23

V.      CONCLUSION...............................................................25

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Abdallah v. Coca–Cola Co.*, 186 F.R.D. 672 (N.D. Ga.1999) ............................... 17

*Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83

  (2000).......................................................................... 17, 22, 23, 24, 25

*Bublitz v. E.I. Dupont De NeMours and Company*, 196 F.R.D. 545

  (S.D. Iowa 2000)……….…............................................…...17, 21

*Chavarria v. Ralph's Grocery Co.*, 733 F.3d 916 (9th Cir. 2013)................... 23, 24

*Chindarah v. Pick Up Stix, Inc.*, 171 Cal.App.4th 796 (2009) ............................. 22

*Fair Housing Council of Cent. California v. Tylar Property Management Co.*,

  975 F. Supp. 2d 1115 (E.D. Cal. 2012) ................................................ 23

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981) ......................................... 16

*In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 527 F. Supp. 2d 1053

  (N.D. Cal. 2007)............................................................................ 21

*Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985)........... 17

*Lhotka v. Geographic Expeditions, Inc.*, 181 Cal.App.4th 816 (2010) ................. 17

*Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218 (S.D. Ala. 2008).......18, 19, 20

*Maddock v. KB Homes, Inc.*, 248 F.R.D. 229 (C.D. Cal. 2007) ............................ 17

*Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006) ...................................... 22

*Mevorah v. Wells Fargo Home Mortg., Inc.*, Case No. C 05-1175 MHP,

  2005 WL 4813532 (N.D. Cal. Nov. 17, 2005)……….…..................16, 19

*Morden v. T-Mobile USA, Inc.*, Case No. C05-2112RSM, 2006 WL 2620320

  (W.D. Wash. Sept. 12, 2006)............................................................. 21

*Sjoblom v. Charter Communs., LLC*, 2007 U.S. Dist. LEXIS 94829

  (W.D. Wis. Dec. 26, 2007)…………………….................................20

*Trivedi v. Curexo Technology Corp.*, 189 Cal.App.4th 387 (2010) ..................... 24

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

*Villa v. United Site Servs. of Cal., Inc.*, 2012 U.S. Dist. LEXIS 162922
  (N.D. Cal. Nov. 13, 2012)......................................................................20

*Watkins v. Wachovia Corp.*, 172 Cal.App.4th 1576 (2009)...................................22

## STATUTES

California Labor Code §226(a)..................................................................24

## RULES

California Rule of Professional Conduct 3-600.........................................19

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION.

By this motion, Plaintiff requests that the Court enter an order limiting further communications between Defendant employer San Luis Ambulance Service, Inc. ("SLA") and the putative class regarding this lawsuit, disregarding the falsely obtained declarations, settlement agreements and arbitration agreements, issue a curative letter to the putative class, and enter other relief related to SLA's improper and coercive tactics in procuring arbitration agreements, declarations and purported settlement agreements from unrepresented class members in the weeks and months following the filing of this lawsuit.

This class action lawsuit seeks to recover substantial unpaid wages on behalf of non-exempt Paramedics and Emergency Medical Technicians ("EMTs") for the period October 9, 2009 to the present.   In the weeks and months that followed the filing of the complaint, SLA held several in-person meetings with putative class members and management, including CEO Frank Kelton, to implement an arbitration policy.   Putative class members currently employed with SLA were given a *Hobson's choice* – agree to arbitrate all claims or lose your job. Although many of the putative class members ultimately signed the arbitration agreements, these agreements cannot be used to compel arbitration in this action for several reasons.  First of all, the arbitration agreements are with San Luis Ambulance, Inc., which is NOT the legal entity that employs the putative class. That legal entity is San Luis Ambulance Service, Inc., and there are no signed arbitration agreements between that entity and the putative class.  Secondly, the agreements cannot apply retroactively to claims that accrued prior to their execution (the vast majority of claims in this action) nor can they apply to Plaintiff's claim under the Private Attorneys General Act ("PAGA").

Shortly after holding meetings between SLA's top brass and the putative class, SLA circulated a document that SLA described as a "questionnaire" for

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

members of the putative class to fill out, telling them that they could "help" SLA by giving their feedback regarding several specific aspects of their employment, namely, rest breaks, meal breaks, hours of work, overtime wages and timely payment of wages.   As it turned out, putative class members were not filling out "questionnaires," but were instead signing sworn declarations under penalty of perjury that would later be used against their interests in this lawsuit. *See, e.g.,* Exh. O, P, and Q.[1]  Following the underhanded and fraudulent collection of these declarations, SLA used the falsely obtained information to induce the putative class members to sign purported settlement agreements and releases for *all* employment related claims, including claims that have never been asserted in this lawsuit and were not even remotely related to the information contained in the declarations (such as claims under the Fair Employment and Housing Act).  At no time did SLA disclose to the putative class that they were signing formal legal documents that SLA would use against their interests in this putative wage and hour class action lawsuit.

SLA's heavy-handed tactics did not end there.   After SLA produced declarations from approximately 71 putative class members in discovery, Plaintiff insisted that she be entitled to cross-examine the declarants.   Although SLA produced these declarations, SLA and its counsel refused to accept service of deposition notices for the declarants and insisted that Plaintiff serve third-party subpoenas.  Consequently, Plaintiff requested that SLA provide the contact information for the declarants in order for Plaintiff to serve subpoenas.  SLA refused to do so unless Plaintiff agreed to a *Belaire-West* notice.   After weeks of negotiation, the parties filed a proposed *Belaire-West* notice order for court approval, which the Honorable Suzanne H. Segal entered in late August 2014. Consistent with Judge Segal's order, the *Belaire-West* Notice was mailed to the

---

[1] Attached to the concurrently-filed declaration of Hernaldo J. Baltodano.

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

putative class on September 11, 2014.   The very next day, on September 12, 2014, Chris Javine, SLA's General Manager and one of SLA's FRCP Rule 30(b)(6) deponents, emailed the putative class and told them:

> Last winter, when we met with staff to inform you about the lawsuit filed against the company by Leslie Javine, **we warned you** that at some point Leslie's lawyers might ask the company to turn over your personal contact information in connection with her lawsuit. That has now happened, and we want to tell you about what you can do to protect your privacy and avoid being contacted by Leslie's lawyers. *See* Exh. D at 19-10 (emphasis added).

SLA's conduct not only undermined Judge Segal's order, but misled and discouraged putative class members from participating in this case and from contacting Plaintiff's counsel.   Indeed, all but two of the declarants objected to their contact information being provided to Plaintiff's counsel.   Thus, while taking the steadfast position that it would not make declarants available for deposition absent Plaintiff serving subpoenas and insisting on a *Belaire-West* notice, SLA went behind the Court and Plaintiff's backs to solicit opt-outs.   SLA later provided and paid for legal counsel for the declarants during their depositions, even though it would not even accept deposition notices for the declarants.

For these reasons as further discussed below, the purported settlement agreements are unenforceable because they were obtained through fraud, are adhesive contracts with no opportunity for negotiation, and are procedurally and substantively unconscionable.   Based on the Court's broad authority to regulate class actions, Plaintiff respectfully requests that the Court: (1) limit all communication between SLA and potential class members regarding this lawsuit; (2) enter a ruling that the all of the declarations, purported settlement agreements, and arbitration agreements signed by putative class members be disregarded by the Court should SLA attempt to use them for any reason; (3) issue a curative

1  notice from the Court to potential class members explaining that any declarations,

2  settlement agreements, and arbitration agreements they signed will not be

3  considered by the Court, and that SLA cannot retaliate against them for

4  cooperating with Plaintiff's counsel or otherwise participating in this lawsuit; (4)

5  require SLA to produce the contact information for all declarants; and (5) enter

6  any other relief that is warranted under the circumstances.

7  **II.  FACTUAL BACKGROUND.**

8  **A.    A Summary of the Lawsuit and Relevant Procedural History.**

9        SLA operates a Paramedic service in San Luis Obispo County and employs

10  approximately 150 putative class members – non-exempt Paramedics and EMTs.

11  These employees respond to calls from various stations located throughout San

12  Luis Obispo County.   Plaintiff worked for SLA as a non-exempt EMT and

13  Paramedic from approximately August 2003 to June 6, 2013.  As an EMT and

14  Paramedic, Plaintiff's job duties consisted of driving patients to hospitals and

15  medical offices, and providing patient care in the back of the ambulance as an

16  Attendant.   At all relevant times, Plaintiff and the putative class worked 24 and

17  48-hour on duty shifts without required daily overtime and double-time

18  compensation.  Because they were required to remain on duty during the entirety

19  of these shifts, moreover, putative class members did not receive duty-free meal

20  and rest periods.  Putative class members also received non-discretionary bonuses

21  for picking up shifts and being "on-call" while off-duty, but the value of these

22  bonuses were never included in their regular rates of pay, thereby compounding

23  SLA's failure to pay required daily overtime and double-time wages.

24        On October 9, 2013, Plaintiff Javine filed this putative wage and hour class

25  action in the United States District Court, Central District of California, Case No.

26  CV13-07480-BRO (SSx), alleging the following causes of action: (1) Failure to

27  Pay All Overtime Wages; (2) Violation of the Fair Labor Standards Act; (3) Wage

28  Statement Violations; (4) Waiting Time Penalties; (5) Violation of Business &

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

Professions Code section 17200 *et seq*; and (6) Civil Penalties under the Private Attorneys General Act.  On December 16, 2014, Plaintiff Dylan Stewart filed a putative wage and hour class action lawsuit against SLA, which pled additional claims for meal and rest period violations. *See* Case No. CV 13-9458–BRO-(SSx). On March 7, 2014, the Court consolidated this action and the *Stewart* action (*see* Docket Entry ("DE") No. 24) and, on April 17, 2014, appointed Plaintiff Javine's counsel as lead counsel. *See* DE No. 29.  In compliance with this Court's order dated August 29, 2014 (DE No. 33), Plaintiff Javine moved for certification of all claims encompassed in the consolidated actions on November 3, 2014.

On December 31, 2013, SLA filed its notice of interested parties, identifying itself as having "a pecuniary interest in the outcome of this case." *See* DE No. 8.  On January 2, 2014, this Honorable Court issued its Order Setting Scheduling Conference and, among other things, requested that the parties include a "detailed discovery plan" in their Joint Rule 26(f) Report, including "the subjects on which discovery may be needed and whether discovery should be conducted in phases." *See* DE No. 9 at 3:20-27.   In the parties' Joint Rule 26(f) Report, SLA proposed "tiered" discovery consisting of the exchange of initial disclosures and exchange of documents, key depositions focused on class and conditional certification, and then "focused written discovery." *See* DE No., 17 at 9:22-26.  Unbeknownst to Plaintiff and as detailed in this motion, immediately after Plaintiff filed this lawsuit, SLA management, including its CEO Frank Kelton, held in-person meetings with the putative class. *See* Exh. D at 19-1, 19-10.[2]  SLA obtained sworn declarations and purported settlement agreements from many putative class members under false pretenses, and currently employed putative class members were forced to agree to arbitration or lose their jobs (*see* Sections IIB and II.C, below).  Notably, nowhere in the report did SLA inform the

---

[2] Attached to the Declaration of Hernaldo J. Baltodano, ¶5.

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

1  Court that it was entering into individual settlement agreements with putative

2  class members or conducting other forms of discovery, such as having putative

3  class members respond to a "questionnaire," which was actually a declaration.

### B. SLA Undercuts the Court-Approved *Belaire-West* Notice To Solicit Opt Outs from the Putative Class Members.

In its Rule 26 initial disclosures dated March 24, 2014, SLA identified various witnesses, including EMTs Pamela McLean, Natacia Garcia, and Amanda Lamar. *See* Exh. C to the Declaration of Hernaldo J. Baltodano ("Baltodano Decl.") at 2:27-3:4.  A few months later, on June 20, 2014, SLA produced approximately 71 declarations from putative class members which SLA intended to rely on to oppose class certification, including declarations from the same witnesses it had disclosed in its initial disclosures, including Pamela McLean, Natacia Garcia, and Amanda Lamar. *Id.* at Exhs. O, P, and Q.  Consequently, on July 15, 2014, Plaintiff informed SLA's counsel that Plaintiff had a right to depose these declarants; accordingly, Plaintiff served deposition notices for the declarants, and proposed that SLA not rely on the declarations in opposition to class certification if it refused to make declarants available for deposition. Baltodano Decl., ¶8 and Exh. G attached thereto.

On July 23, SLA's counsel informed Plaintiff that he could not accept service of deposition notices for the declarants, stating, "I also confirmed that we do not represent the individual, subordinate employees in question.  Accordingly, I do not have authority to agree to accept service on their behalf.  Instead, it appears that subpoenas would need to be served on each deponent." Baltodano Decl., ¶9 and Exh. H attached thereto.  Ultimately, SLA refused to enter into Plaintiff's proposed stipulation. Baltodano Decl., ¶10 and Exh. I attached thereto. Consequently, Plaintiff requested that SLA immediately provide contact information for the declarants, which she had sought in discovery but SLA had

1  objected to producing,[3] stating, "Defendant cannot have it both ways – by
2  secure[ing] declarations from dozens of employees and then stone-walling our
3  ability to cross-examine these individuals by withholding their contact
4  information since we need that information to serve the subpoenas and depose
5  them before the class certification deadline." Baltodano Decl., ¶11 and Exh. J
6  attached thereto.
7         SLA refused to disclose any class member contact information, including
8  the contact information of the putative class members whose signed declarations
9  had already been produced, and insisted on putative class members receiving a
10 *Belaire-West* notice process before SLA produced any contact information.
11 Baltodano Decl., ¶12.   Even though Plaintiff vigorously disagreed that the
12 process needed to be used, Plaintiff agreed to use it to avoid a lengthy and costly
13 discovery battle with SLA's counsel. *Id.*  Plaintiff and SLA negotiated and agreed
14 to a *Belaire-West* notice, the entire cost of which would be borne by Plaintiff. *Id.*
15 and Exh. K attached thereto. After weeks of negotiation, on August 26, 2014, the
16 parties filed a stipulation requesting that the Court enter an order authorizing a
17 *Belaire-West* notice. *See* DE No. 31.  On August 26, 2014, the Honorable Suzanne
18 H. Segal entered an order for a *Belaire-West* notice, stating that the parties "by
19 and through their respective counsel have stipulated and agreed to the following
20 Protective Order and *Belaire* Notice." *See* DE No. 32 at 1:18-25.
21        Consistent with Judge Segal's order, the agreed-upon third-party
22 administrator, CPT Group, Inc., mailed the *Belaire-West* notice to the putative
23 class on September 11, 2014. *See* Baltodano Decl., ¶13 and Exh. L attached
24 thereto.  The very next day, on September 12, 2014, Chris Javine, SLA's General
25 Manager and one of the FRCP Rule 30(b)(6) deponents, emailed the putative
26
27
28 ─────────────────
   [3] *See* Exh. E to Baltodano Decl.

class. *See* Deposition of Mayra A. Casarez ("Casarez Depo") at 47:23-48:48:4.[4]
Despite the court-ordered *Belaire-West* notice, Mr. Javine sent the following email
to the putative class:

> In the next few days, many of you will receive in the mail a notice
> about your privacy rights and a postcard that you can complete and
> return to protect your privacy.   We want to alert you of this and
> explain what is going on.
>
> Last winter, when we met with staff to inform you about the
> lawsuit filed against the company by Leslie Javine, we warned you
> that at some point Leslie's lawyers might ask the company to turn
> over your personal contact information in connection with her
> lawsuit.   That has now happened, and we want to tell you about
> what you can do to protect your privacy and avoid being contacted
> by Leslie's lawyers.
>
> Through our attorneys, the company has objected to turning over
> your personal contact information, and has insisted that you be
> allowed to choose whether your home address and telephone
> numbers will be turned over to Leslie's lawyers.   As a result, the
> court has ordered Leslie's lawyers to hire an outside service to
> notify you of your rights and give you a chance to prevent your
> personal information being turned over to them.   That outside
> service, CPT Group, will be mailing a notice and a prepaid return
> postcard to each of you.   A sample of what the notice and postcard
> look like is attached.
>
> During our meetings last winter, many of you expressed strongly
> that you do not wish to be involved in or get dragged into Leslie's
> lawsuit.  If you do not want Leslie's lawyers to contact you, then
> you should exercise your right to object to your personal
> information being turned over to them.   Here are the ways you can
> do that:
>
> > 1)    Complete and mail the postcard you receive in the mail.
> > The postage is already paid.  OR

---

[4] Attached as Exhibit Z to the Baltodano Decl.

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

2)   If you wish, complete the blank sample postcard attached to this message and fax, email or otherwise get it to me, and we will forward it to CPT Group.  OR

3)   If you already signed a written settlement and release agreement with the company, then you may simply mail or email a copy to CPT Group, because the agreement states that you do not wish to participate in Leslie's lawsuit and opt out of any involvement.  If it is more convenient for you, you may also just ask me to forward an electronic copy of your signed agreement to CPT Group for you.

If you do not take one of the above actions before October 2, then your contact information will be turned over to Leslie's lawyers, and they very likely will try to contact you at home or by phone. Please remember that you are under no obligation to speak with them.

The company appreciates the strong support it has received from all of you, and we apologize that you are being inconvenienced in this way.  Please call me if you have any questions or concerns, or if we can assist you in protecting your privacy rights.

Thank you
Chris Javine, GM
805-543-2626[5]

SLA's conduct is wholly inappropriate.   Not only did SLA undermine the Court's order, SLA's communication to the putative class is misleading and aimed at discouraging putative class members from participating in this case.  Because of Chris Javine's email, all but two of SLA's declarants objected to their contact information being provided to Plaintiff's counsel.  Thus, while taking the steadfast position that it would not make declarants available for deposition absent Plaintiff serving subpoenas and insisting on a *Belaire-West* notice, SLA went behind the Court and Plaintiff's backs to solicit opt-outs.  Curiously, SLA later provided legal

---

[5] *See* Exhibit D to the Baltodano Decl., at 19-10, 19-11 [Exhibit 19 to Deposition of Mayra A. Casarez).

counsel for declarants during their depositions even though its counsel would not even accept deposition notices for the declarants. *See* Deposition of Michael Duerson ("Duerson Depo") at 50:25-52:1[6]; Casarez Depo at 8:19-9:3, 30:4-9, 30:22-31:23. SLA also insisted, over the objection of Plaintiff's counsel, that Chris Javine be allowed to physically attend the depositions of the declarants. As detailed herein, not only is Chris Javine a supervisor, *see* Cazares Depo at 31:15-32:16, Mr. Javine (along with SLA's counsel) drafted the mandatory arbitration agreement and purported settlement agreements for the putative class that were primary topics of questioning during the depositions. Consequently, over Plaintiff's vigorous objection, all of the declarants deposed in this action were forced to testify before Mr. Javine.

**C. <u>SLA Attempts to Make Arbitration Of All Claims A Condition Of Continued Employment</u>.**

In December 2013, SLA held several mandatory meetings with putative class members. Present at this meeting were SLA's CEO, Frank Kelton, Betsy Kelton, Justin Kelton, and Chris Javine, among others. *See* Deposition of Casey Hidle ("Hidle Depo") at 20:3-24;[7] Casarez Depo at 22:8-17; Duerson Depo at 17:21-24; Exh. D to Baltodano Decl., at 19-5. At these December 2013 meetings, SLA introduced a new mandatory arbitration agreement for EMTs and Paramedics. Chris Javine drafted the arbitration agreement with the assistance of SLA's counsel. *See* Deposition of Chris Javine ("Javine Depo") at 13:18-25, 14:11-17.[8]

In order to keep their jobs with San Luis Ambulance Service, Inc., putative class members were required to submit all employment-related claims to arbitration. *See* Javine Depo at 16:10-14; Duerson Depo at 19:16-20:21;

---

[6] Attached as Exhibit Y to the Baltodano Decl.
[7] Attached as Exhibit X to the Baltodano Decl.
[8] Attached as Exhibit R to the Baltodano Decl.

Deposition of Chad Robertson ("Robertson Depo") at 83:2-10[9]; Casarez Depo at 47:13-16.  Putative class members were required to attend a staff meeting where they signed the arbitration agreement. Duerson Depo at 17:7-17.  Michael Duerson testified, "[I]f we chose not to agree with this policy, we had the option to no longer be employees." Duerson Depo at 20:2-9.   During the meetings in December 2013, putative class members were told about the "general scope of the lawsuit," and according to putative class member Michael Duerson, Frank Kelton was "extremely emotional and upset about the lawsuit." *Id.* at 18:8-21.   Mr. Duerson testified that Frank Kelton conveyed that "he felt that his – he was extremely fair with us, and that this, basically, destroyed all that was fair that the company had done for all of the employees and good that he had done for all of the employees." *Id.* at 18:12-21.

Mr. Duerson testified that his understanding of the arbitration policy was to "prevent future lawsuits against unfair employment practices by having the employee agree to go to arbitration instead of taking the matter to court." Duerson Depo at 21:8-17; 22:7-12.  Notably, the arbitration agreement provides conflicting provisions regarding the rules that will apply – either the procedural rules of the American Arbitration Association, *see* Javine Depo at 16:18-24, or the procedural rules of ADR Services. Casarez Depo at 47:17-22, 79:4-9; Javine Depo at 21:17-22:13.   None of these rules were attached to the arbitration agreement.

**D. Putative Class Members Are Paid $150 For Releasing All Employment-Related Claims Based On So-Called "Questionnaires."**

In addition to forcing current employees to choose between keeping their jobs or agreeing to arbitration all of their claims, SLA misled putative class members by having them fill out "questionnaires" that were used to offer them $150 for a release of *all employment-related claims*.  On January 28, 2014, SLA's General Manager, Chris Javine, emailed the putative class and told them that they

---

[9] Attached as Exhibit W to the Baltodano Decl.

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

could "help" SLA by completing a questionnaire. Casarez Depo at 37:6-19.   The email to the putative class stated:

> When Frank Kelton met with you before Christmas to discuss the lawsuit that has been filed against the company he mentioned that we would be getting back to you to explain what else you could do to help the company.   Having your honest answers regarding our company policies would be very helpful.   Accordingly, we have prepared the attached questionnaire regarding our company policies and how you follow them.   If you could please complete the questionnaire and return it to me as soon as possible it would be much appreciated.   You may return it by fax (540-5758), e-mail (chris@SLA.md) or company courier ("green bag") whichever is most convenient for you.
>
> If you should have any questions regarding the questionnaire please contact me or Joe Piedalue.
>
> Thank You
> Chris Javine, GM
> 805-543-2626[10]

Based on SLA's characterization of these documents as "questionnaires," putative class members believed that they were filling out questionnaires, and nothing else. As it turns out, however, putative class members had signed sworn declarations under penalty of perjury. Robertson Depo at 44:13-45:16; Hidle Depo at 44:3-25. Ultimately, SLA paid $150 to all putative class members who signed a purported settlement agreement *based* on their responses in the declarations – falsely characterized as "questionnaires" by SLA. Again, Chris Javine drafted the settlement agreements, and did so with the assistance of SLA's counsel. Javine Depo at 19:2-16. One of SLA's 30(b)(6) witnesses, Mr. Javine testified that SLA paid $150 to each putative class member "across the board." Javine Depo at 20:3-11. Significantly, Mr. Javine testified that the $150 was based on responses

---

[10] *See* Exh. D to Baltodano Decl., at 19-1, 19-2 through 19-4.

1  provided by putative class members to the "questionnaires."  Javine Depo at 21:1-

2  16.  Moreover, putative class members were asked to sign these settlement

3  agreements although, at the time they were signed, they did **not** believe that they

4  had a dispute with SLA about unpaid wages. Casarez Depo at 57:13-58:3, 78:6-

5  16.

6        At no time did SLA disclose to putative class members that (1) these

7  "questionnaires" were actually sworn declarations signed under penalty of perjury,

8  (2) the questionnaires would be used against their interests in this putative wage

9  and hour class action lawsuit brought on their behalves, and (3) the responses to

10  the questionnaires would dictate the amount of money they would receive as

11  consideration for the release of all their employment-related claims. Duerson

12  Depo at 38:10-39:22; Hidle Depo at 45:1-46:7.  Putative class members Chad

13  Robertson and Mayra Casarez testified:

14
15  | Question: | Prior to filling out this questionnaire were you ever told that it could be used against your interests? |

16  | Answer: | I don't believe so. |
17  | Question: | Okay.  Were you ever told that this questionnaire could be used as evidence in the lawsuit filed by Leslie Javine? |

18  | Answer: | I don't know. *See* Robertson Depo at 47:10-16 |
19                      \*\*\*

20  | Question: | Okay.   But my question is, did Mr. Javine specifically tell you that you were being asked to sign a declaration? |

21  | Answer: | No. |
                    \*\*\*

22  | Question: | Did anyone at San Luis Ambulance tell you that filling out the |
23  | | questionnaire or declaration could be used against you in this |
24  | | lawsuit? |
25  | Answer: | No. *See* Casarez Depo at 38:22-25, 39:23-40:1. |

26        Significantly, putative class members were not told that the *Javine* and

27  *Stewart* lawsuits sought unpaid overtime wages and premium pay for meal and

28  rest period violations before they were presented with the purported settlement

agreements.  Nor were employees provided with copies of the *Javine* and *Stewart* lawsuits. Casarez Depo at 16:2-6, 58:9-20.  As a result, putative class members did not understand what the alleged "unfair pay practices" were, nor informed of the potential value of the claims they were being asked to release for $150. Michael Duerson even went as far as to state: "I do not fully understand the terms of the lawsuit, and therefore I would have no ability to have any understanding as to a value of such claims."  Duerson Depo at 42:6-22; *see also* Robertson Depo at 58:2-22; Hidle Depo at 21:6-22:17, 58:19-25; Casarez Depo at 77:5-15.   In fact, putative class members were not given one iota of information about how SLA arrived at an across-the-board $150 payment for employees who signed the settlement agreement.  Duerson Depo at 44:22-45:1; Casarez Depo at 60:19-21. Mayra Casarez testified that Joe Piedalue, another 30(b)(6) deponent, informed her that the $150 payment was "just a sum that they [SLA] came up with paying for signing the agreement." Casarez Depo at 61:6-13.

Perhaps most shocking is the fact that the purported settlement agreements require putative class members to "release and forever discharge" SLA "from all lawsuits, charges, complaints, claims, demands, liabilities, obligations, and causes of action of any nature whatsoever arising out of or relating in any way to your employment by the Company," in addition to the unpaid wage claims at issue in this lawsuit. *See* Exhs. S and U at No. 3.  The broad general release of claims, moreover, is not mutual, to the detriment of the putative class members who signed them:

> Question:    Do you know whether San Luis Ambulance was releasing you from any claims they might have against you with this settlement agreement that you signed?
>
> Answer:      Not that I'm aware of. *See* Casarez Depo at 73:21-74:1.

Testimony from putative class members reflects that they did not understand that they were releasing all employment claims.  Michael Duerson testified that his understanding was that the settlement agreement would ***not***

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

release claims other than those Labor Code claims at issue in this lawsuit. Duerson Depo at 43:3-44:15.  Similarly, Chad Robertson and Casey Hidle testified that they believed they were only releasing SLA from claims related to meal and rest periods, the payment of wages, and the claims at issue in the *Javine* and *Stewart* lawsuits. Robertson Depo at 56:3-12; Hidle Depo at 52:4-20, 52:22-53:1.  Mr. Hidle testified:

> Question: Okay, so you've previously testified that your understanding of the release was that it was a compromise of the claims asserted in this specific lawsuit; is that correct?
> Answer: That is correct, sir. *See* Hidle Depo at 53:24-54:3.

Mr. Hidle also testified that he could not explain what the settlement agreement was because "I'm not a lawyer" and it would be "speculation." Hidle Depo at 47:6-25, 48:4-7, 48:23-49:23.  Putative class members also testified that they did not believe they could negotiate any terms in the release agreement – including the general release of all employment-related claims. Robertson Depo at 58:25-59:7; Hidle Depo at 53:16-23; 70:2-7.

Despite the complexity in these agreements, ensuing confusion, and the fact that putative class members were releasing **all** employment-related claims, SLA did not inform employees that they could contact Plaintiff Javine and Stewart's attorneys about the settlement agreements, nor was the general release of all employment-related claims explained to them.  Casarez Depo at 74:2-9, 73:4-14. To ensure that the unconscionable settlement agreements foisted upon the putative class members were not challenged, SLA included a provision in the agreements that putative class members shall be responsible for SLA's attorneys' fees, costs, and damages in the event that they challenged the settlement agreements. *See* Exhs. S and U at No. 6 ("If either party breaches any provision of this Agreement, the prevailing, non-breaching party shall be entitled to recover from the other party all damages, costs, expenses and attorneys' fees incurred as a result.").

///

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

III. **SUMMARY OF RELIEF SOUGHT**.

On the basis of these facts, Plaintiff requests that the Court: (1) limit all communication between SLA and potential class members regarding this lawsuit; (2) enter a ruling that the all of the declarations, purported settlement agreements, and arbitration agreements signed by putative class members be disregarded by the Court should SLA attempt to use them for any reason; (3) issue a curative notice from the Court to potential class members explaining that any declarations, settlement agreements, and arbitration agreements they signed will not be considered by the Court, and that SLA cannot retaliate against them for cooperating with Plaintiff's counsel or otherwise participating in this lawsuit; (4) require SLA to produce the contact information for all declarants; and (5) enter any other relief that is warranted under the circumstances.

IV. **LEGAL ARGUMENT**.

A. **Legal Standards Governing This Motion**.

"Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981). Although pre-certification communications between the defense and potential class members are generally permitted, the Court may limit such communications based on "specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* "Courts have limited pre-certification communications with potential class members after misleading, coercive, or improper communications were made." *Mevorah v. Wells Fargo Home Mortg., Inc.*, Case No. C 05-1175 MHP, 2005 WL

1   4813532 at *3 (N.D. Cal. Nov. 17, 2005); *see also Maddock v. KB Homes, Inc.*,

2   248 F.R.D. 229, 237 (C.D. Cal. 2007).[11]

3        A purported settlement agreement and release is governed by contract

4   principles and subject to all defenses available to the enforcement of a contract

5   including fraud, oppression, duress, statutory defenses, and unconscionability. *See*

6   *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th83, 114 (2000).

7   Procedural unconscionability occurs where a contract or clause involves

8   oppression, consisting of a lack of negotiation and meaningful choice, or surprise,

9   such as where the term at issue is hidden within a wordy document. *See Lhotka v.*

10   *Geographic Expeditions, Inc.*, 181 Cal.App.4th 816, 821 (2010).  Substantive

11   unconscionability occurs where the provision at issue reallocates risks in an

12   objectively unreasonable or unexpected manner. *Id.*  Both procedural and

13   substantive unconscionability must be found before a term will be deemed

14   unenforceable, but both need not be present to the same degree; rather, the more

15   substantively oppressive the contract term, the less evidence of procedural

16   unconscionability is required to come to the conclusion that the term is

17   unenforceable, and vice versa. *Armendariz*, 24 Cal.4th at 114.

18

19   ---

20   [11] Other courts have also recognized the inherent risk of coercion and duress that is present in
     employer-employee communications, and which are especially severe when an employer is

21   asking an employee to release any and all claims that it may have against the company.   The
     Eleventh Circuit addressed these concerns in *Kleiner v. First National Bank of Atlanta*, 751

22   F.2d 1193 (11ths Cir. 1985).  In *Kleiner*, the defendant employer was secretly soliciting requests
     from current employees to exclude themselves from the class action, just as SLA has done here.

23   In discussing the concerns with such communications, the Eleventh Circuit stated, "[a]
     unilateral communications scheme, moreover, is rife with potential for coercion. 'if the class

24   and the class opponent are involved in an ongoing business relationship, communications from
     the class opponent to the class may be coercive…'" *Id.* at 1202.  The court went on to declare,

25   "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of
     informed consent by urging exclusion on the basis of a one-sided presentation of the facts,

26   without opportunity for rebuttal.  The damage from misstatements could well be irreparable."
     *Id.* at 1203.  *See also Bublitz v. E.I. Dupont De NeMours and Company*, 196 F.R.D. 545, 548

27   (S.D. Iowa Sep. 26, 2000); *Abdallah v. Coca–Cola Co.*, 186 F.R.D. 672, 678 (N.D.Ga.1999).

28    

### B.    <u>The Court Should Strike the Declarations Because SLA Used Misleading and Coercive Tactics to Obtain Them.</u>

In *Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218 (S.D. Ala. 2008), the court granted a motion to strike 245 declarations that an employer gathered from its employees within days after the filing of a FLSA opt-in collective action.  The declarations were nearly identical to each other, and stated that the employees had been paid for all of their time worked and did not miss any breaks.  The court found that the employer obtained the declarations improperly and in bad faith based on the following circumstances: (1) defendant obtained the declarations in a "coordinated blitz of declaration-gathering" immediately after the filing of the complaint; (2) defendant obtained the declarations during work hours; (3) in collecting the declarations, defendant proceeded with actual knowledge of the litigation; (4) the declarations concerned the very subject matter of the litigation; (5) despite this, the defendant failed to apprise the declarants of the lawsuit, or their potential rights thereunder, and failed to advise the declarants that the declarations could adversely affect their rights in the litigation; (6) defendant told the declarants that the purpose of the meeting was that the company was "conducting a survey," rather than to obtain declarations; and (7) the employer sought to use the declarations to defeat class certification.  *Id.* at 1245-46.

On the basis of these facts, the court held that the employer "engaged in conduct that would reasonably be expected to mislead and deceive the prospective plaintiffs concerning the nature, purposes and implications of their participation in the declaration process."  *Id.* at 1227.  "Of critical importance, [the employer's] lawyers neither informed the declarants that a class action lawsuit concerning the very pay practices about which they were being 'surveyed' was pending, nor that those declarants were themselves potential class members whose execution of a form declaration for [the employer] might effectively strip them of an opportunity to join in the lawsuit."  *Id.* at 1228.

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

Similarly, in *Mevorah v. Wells Fargo Home Mortg., Inc., supra*, the court entered an order limiting pre-certification communications where the employer made misleading and coercive statements to current employees after the filing of a lawsuit challenging the employer's pay practices.  The employer's attorneys contacted employees by telephone, made misleading statements about the plaintiffs' lawsuit, interviewed the employees, and prepared declarations for them to sign. *See* 2005 WL 4813532 at *4-5.  The court held that the communications had a "heightened potential for coercion" because of the ongoing employer-employee relationship: "[I]t is . . . reasonable to assume that an employee would feel a strong obligation to cooperate with his or her employer in defending against a lawsuit." *Id.* at *4 (citations omitted).   The *Mevorah* court also concluded that the employer's attorneys had violated Cal. Rule of Prof. Conduct 3-600 because they did not inform the employees whom they contacted that "the organizations interests are or may become adverse to those of" the employees, and that any information that the attorneys collected "may be 'used in the organization's interest' if defendant 'becomes adverse to the constituent.'" *Id.* at *4-5.[12]

Here, Plaintiff has submitted clear and specific evidence establishing that SLA has "engaged in conduct that would reasonably be expected to mislead and deceive the prospective plaintiffs concerning the nature, purposes and implications of their participation in the declaration process." *Longcrier*, 595 F. Supp. 2d at 1227. *See also Villa v. United Site Servs. of Cal., Inc.*, 2012 U.S. Dist. LEXIS 162922, *42-43 (N.D. Cal. Nov. 13, 2012) (ruling that 206 employee declarations,

---

[12]SLA has not produced a single shred of documentation reflecting that SLA and its counsel ever complied with California Rule of Professional Conduct 3-600, which obliged them to disclose that: (1) a lawsuit had been filed, and the employees' potential rights to overtime and other compensation was at issue in the pending litigation; (2) the employees' interests may be adverse to SLA's in the litigation; (3) SLA and its lawyers represented only SLA's interests, and not the interests of the employees; and (4) the employees could obtain their own counsel. *Mevorah v. Wells Fargo Home Mortg., Inc., supra*, 2005 WL 4813532 at *5.

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

1   which the employer gathered during mandatory meetings with employees during

2   working hours, would have no "significant probative value," and ordering that a

3   curative notice be sent to class members informing them that the Court "will

4   disregard any declarations they may have signed"); *Sjoblom v. Charter*

5   *Communs., LLC*, 2007 U.S. Dist. LEXIS 94829 (W.D. Wis. Dec. 26, 2007)

6   (limiting employer's communications with employees and striking 62 declarations

7   where the employer's attorneys obtained the declarations under false pretenses

8   and did not inform employees of their rights).

9            First, SLA misled the employees about the purpose of the questionnaire.

10  Just as in *Longcrier*, where the defendant employer's attorneys falsely told the

11  declarants that the purpose of the meeting was to "conduct a survey," SLA falsely

12  told putative class members that they were simply being asked to fill out

13  questionnaires about SLA's labor practices.  Putative class members were not

14  informed that they were being asked to sign sworn declarations under penalty of

15  perjury that would be used against their interest in this class action lawsuit and

16  undermine Plaintiff Javine and Stewart's claims in this lawsuit.   Like *Longcrier*,

17  SLA lulled employees into falsely believing that the questionnaires were

18  informational, rather than formal legal documents signed under penalty of perjury.

19  Second, SLA never told putative class members that they might submit the

20  declarations to the Court to support SLA's side of this lawsuit against the

21  employees.   Third, SLA used coercive means to obtain the declarations, including

22  in-person meetings between SLA's CEO Frank Kelton and the putative class.  *See,*

23  *e.g.,* Hidle Depo at 20:3-24; Casarez Depo at 22:8-17; Duerson Depo at 17:21-24;

24  Exh. D to Baltodano Decl., at 19-1.   As one court has stated: "In-person

25  solicitations pose a particular threat of coercion. . . . [U]nsupervised oral

26  solicitations produce distorted statements and the coercion of susceptible

27  individuals: [I]n-person solicitation may exert pressure and often demands an

28  immediate response, without providing an opportunity for comparison or

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

reflection.  The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education. *Bublitz v. E.I. duPont de Nemours & Co.*, 196 F.R.D. 545, 549 (S.D. Iowa 2000) (citations omitted).

All of these facts, in addition to the boilerplate format of the declarations, establish that SLA used false pretenses and coercive means to gather the declarations. *See In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 527 F. Supp. 2d. 1053, 1060-61 (N.D. Cal. 2007) (finding "glaring reliability concerns" with respect to declarations that were "nearly identical in terms of language and substance" and were submitted by current employees, therefore carrying "possible pressure arising from ongoing employment relationships"); *Morden v. T-Mobile USA, Inc.*, Case No. C05-2112RSM, 2006 WL 2620320 at *3 (W.D. Wash. Sept. 12, 2006) ("In support of its arguments, defendant relies in part on 99 declarations from current employees, all of whom are potential collective action members. However, the Court will discount those declarations because of the risk of bias and coercion inherent in that testimony.").

### C. The Settlement Agreements Are Unenforceable Because They Were Fraudulently Obtained and Are Unconscionable.

The purported settlement agreements are not enforceable because they were obtained through fraudulent means.  Specifically, SLA circulated a questionnaire to putative class members asking them to respond and provide their "honest" answers in order to help SLA.   Putative class members relied on SLA's representations and filled them out.  The questionnaires themselves state, "I am an employee of San Luis Ambulance, Inc.  I am making this declaration for the purpose of assisting the Company to comply with California and federal wage and hour laws."  At no point did SLA inform employees that they were being asked to sign sworn declarations under penalty of perjury that would be used against the

putative class members in this lawsuit, and to determine the amount of
compensation they would receive in exchange for releasing all of their
employment-related claims.   Given the fraudulent representations that SLA made
to employees in order to obtain the settlement agreements, the settlement
agreements should not be enforced. *See Marder v. Lopez*, 450 F.3d 445, 449 (9th
Cir. 2006) ("In general, a written release extinguishes any obligation covered by
the release's terms, provided *it has not been obtained by fraud, deception,*
*misrepresentation*, duress, or undue influence.") (emphasis added).

The settlement agreements are also unenforceable because a bona fide
dispute about unpaid wages did not exist. *See* Casarez Depo at 57:13-58:3, 78:6-
16.   As a result, their California Labor Code claims could not be settled. *See*
*Chindarah v. Pick Up Stix, Inc.*, 171 Cal.App.4th 796, 803 (2009) ("there is no
statute providing that an employee cannot release his claim to past overtime wages
as part of a settlement **of a bona fide dispute** over those wages") (emphasis
added); *Watkins v. Wachovia Corp.*, 172 Cal.App.4th 1576, 1587 ("when Brown
signed the release of all claims, including wage claims, she believed that she was
entitled to additional overtime compensation.   In other words, when Brown's
employment was terminated, she: (1) received all wages Wachovia conceded were
due to her (based on the time sheets she had submitted); (2) believed she
possessed a claim for further overtime pay; and (3) voluntarily elected to receive
enhanced severance benefits in exchange for releasing her claims against
Wachovia.   Under these circumstances, the release is enforceable.").

In addition, the purported settlement agreements are permeated with
procedural and substantive unconscionability.   Putative class members testified
that the settlement agreements were not negotiable, that they were not apprised of
the value of their potential claims, and not advised to consult with counsel before
signing the settlement agreements. *See Armendariz*, *supra*, 24 Cal.4th at 113
("The term [contract of adhesion] signifies a standardized contract, which,

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it"). Moreover putative class members were required to release all employment-related claims in exchange for a mere $150 – an overly harsh term – that would deprive an employee from making any claim against SLA.  Indeed, putative class members testified that they did not understand that they were releasing *all* employment claims. Duerson Depo at 43:3-44:15; Robertson Depo at 56:3-12; Hidle Depo at 52:4-20, 52:22-53:1, 53:24-54:3.   Significantly, this broad release of claims is not mutual and SLA reserved the right to bring any and all claims against putative class members.  The broad, non-mutual release of claims is substantively unconscionable. *See Armendariz*, 24 Cal.4th at 113 ("a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable'') [internal citations omitted].

Under the totality of the circumstances, the settlement agreements are procedurally and substantively unconscionable and, therefore, unenforceable.  *See, e.g., Fair Housing Council of Cent. California v. Tylar Property Management Co.*, 975 F. Supp. 2d 1115 (E.D. Cal. 2012) (holding that settlement agreements could not be enforced because the "record fails to demonstrate, under the totality of the circumstances, that Plaintiffs voluntarily, deliberately and knowingly intended to waive their claims against Defendants").

**D.**      **The Arbitration Agreements Are Also Unconscionable and Do Not Apply to the Employer of the Putative Class.**

The arbitration agreements are also unenforceable because they, too, are unconscionable.  As detailed above, putative class members had to choose to either keep their jobs or succumb to submitting all future claims to arbitration. There was no opportunity to reject arbitration.  Consequently, the agreements are unconscionable. *See, e.g., Chavarria v. Ralph's Grocery Co.*, 733 F.3d 916, 922

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF

(9th Cir. 2013) (in finding procedural unconscionability, the Ninth Circuit stated, "agreeing to Ralphs' policy was a condition of applying for employment and that the policy was presented on a "take it or leave it" basis with no opportunity for Chavarria to negotiate its terms."). Additionally, it is unclear whether the arbitrations will be governed by the procedural rules of the American Arbitration Association or the procedural rules of ADR Services – neither of which are attached to the arbitration agreements. *See, e.g., Trivedi v. Curexo Technology Corp.*, 189 Cal.App.4th 387, 393 (2010) ("Numerous cases have held that the failure to provide a copy of the arbitration rules to which the employee would be bound, supported a finding of procedural unconscionability. [Citations.]"); *Chavarria, supra*, 733 F.3d at 923 ("we have held that the degree of procedural unconscionability is enhanced when a contract binds an individual to later-provided terms.").

Finally, the arbitration agreements are unenforceable simply because they do not apply to the employer of the putative class. *See Armendariz*, 24 Cal.4th at 697 ("whether an ***employer*** is willing, now that the employment relationship has ended, to allow the arbitration provision to be mutually applicable, or to encompass the full range of remedies, does not change the fact that the arbitration agreement as written is unconscionable and contrary to public policy… No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it.") (emphasis added). Here, the arbitration agreements reference San Luis Ambulance, Inc., which is ***not*** the employer of the putative class – and not the name of the employer that appears on the wage statements of Plaintiff and the putative class. *See De No. 26-3, pages 7 through 18. The legal entity that employed and employs the putative class is San Luis Ambulance Service, Inc. See, e.g.,* Labor Code §226(a) (stating that wage statement must include "the name and address of the legal entity that is the employer"); *see also* DE No. 7 at 1:18; DE No. 8; DE No. 22 at 1:18; DE No. 28

at 1:18 (all identifying San Luis Ambulance Service, Inc. as the defendant and employer).   This is not merely a matter of semantics.   "While arbitration may have its advantages in terms of greater expedition, informality, and lower cost, it also has, from the employee's point of view, potential disadvantages: waiver of a right to a jury trial, limited discovery, and limited judicial review." *Armendariz*, 24 Cal.4th at 115.   As putative class member Michael Duerson testified, his understanding of the arbitration policy was to "prevent future lawsuits against unfair employment practices by having the employee agree to go to arbitration instead of taking the matter to court."   Duerson Depo at 21:8-17; 22:7-12.   For these reasons, the arbitration agreements are not enforceable against members of the putative class and San Luis Ambulance Service, Inc.

## V. **CONCLUSION**.

SLA's conduct has been plainly improper and has blatantly interfered with the administration of justice in this lawsuit.   The evidence demonstrates that SLA procured the declarations, arbitration agreements and releases fraudulently and under false pretenses, and that these documents are rife with defects, including substantive and procedural unconscionability.   For all of the foregoing reasons, Plaintiff now requests that the Court enter an order (1) limiting all communication between SLA and potential class members regarding this lawsuit; (2) disregarding all of the declarations, purported settlement agreements, and arbitration agreements signed by putative class members should SLA attempt to use them for any reason; (3) issuing a curative notice from the Court to potential class members explaining that any declarations, settlement agreements, and arbitration agreements they signed will not be considered by the Court, and that SLA cannot retaliate against them for cooperating with Plaintiff's counsel or otherwise participating in this lawsuit; (4) requiring SLA to produce the contact information for all declarants; and (5) entering any other relief that is warranted under the circumstances.   Plaintiff has submitted a proposed order concurrently herewith.

1

2    Dated:  November 17, 2014

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,
BALTODANO & BALTODANO LLP


Hernaldo J. Baltodano
Attorneys for Plaintiff, the Putative Classes
and Aggrieved Employees

NOTICE OF MOTION AND MOTION TO STRIKE AND OTHER RELIEF